ANDREW J. BATES et al.

v.

HARRY A. NORTON et al.

A judgment entered by confession, and which was made up in part of the amount of a note on which the plaintiff was at the time only contingently liable as endorser, is invalid, to that extent, as against other creditors subsequently obtaining judgments, though the note was afterwards actually paid by the plaintiff; and, where the judgment was collusively entered for the purpose of hindering and delaying other creditors, it will be wholly set aside.

Heard on bill, answer and proofs.

*Mr. James E. Howell*, for Bates & Company.

*Mr. Charles A. Rathbun*, for Wallace, Elliott & Company.

*Mr. Thomas Anderson*, for the defendants.

PITNEY, V. C.

This bill, as originally framed, was a pure creditors' bill for discovery, filed under the eighty-eighth and subsequent sections of the Chancery Practice act, against Harry A. Norton, a judg-

ment debtor. It was filed on the 25th of November, 1895, and was based on a judgment of Bates & Company against Norton, recovered on the 11th of November, 1895, in the Essex circuit court, for the sum of $440.81, damages and costs. On the same day an order of discovery was made against the defendant Norton, and such discovery was had on the 2d of December; and on the 11th of December an amended bill was filed bringing in as defendant John Norton, the father of the judgment debtor, and Sophie Platt, his sister. Subsequently the other complainants, Wallace, Elliott & Company, were, upon proper application, made parties complainant upon the basis of a judgment recovered by them against Harry A. Norton in the Essex circuit court, on the 17th of December, 1895, for the sum of $420.88.

The amended bill set out that the defendant Harry A. Norton was a retail dealer in shoes in Newark; that he started business in the fall of 1894 with an actual capital of $5,000, and in the fall of 1895 had a stock of goods worth $4,000; that on the 30th of October, 1895, he confessed a judgment to his father, John Norton, in the supreme court, for the sum of $1,390 and costs, and a judgment to his sister, Sophie Platt, in the same court, for the sum of $500 and costs; that executions were issued immediately upon these judgments and placed in the hands of the sheriff of Essex, and that the property was immediately advertised for sale for November 6th, including within the time between the advertisement and the sale two holidays—a Sunday and election; and that it was sold on that day in a bulk to either the father or the sister for a sum just enough to pay their judgments; and that the whole stock of goods was shortly afterwards, and before the entry of the Bates judgment, conveyed out of the state and sold or in some way disposed of.

The bill charges that the judgments so confessed to the father and sister were wholly without consideration, and their confession and the sale thereunder a scheme planned and executed for the purpose of defrauding the creditors of the judgment debtor (including the complainants), whom he owed for goods purchased to the amount of $1,500.

The bill prays that the two judgment creditors by confession—father and sister—may make full and true discovery and disclosure of the true consideration of the judgments so confessed, and in what manner the consideration arose and by what the same was evidenced.

The answer, which was filed jointly by the judgment debtor and his father and sister, admits the allegations of the bill that the judgment debtor commenced business with a capital of $5,000, and that at the time of his failure he was indebted to the two complainants herein, and to other creditors of that character, in the sum of about $1,500; admits the confession of the judgments; sets up that, after the setting off of $200 of the goods to the judgment debtor, under the statute, the sheriff proceeded and sold enough of the goods in the store to pay the two confessed judgments, which left goods unsold to the value of about $230; and that the sister, Mrs. Platt, was desirous of continuing the business, and purchased of the judgment debtor for $400 his right, title and interest in the goods and chattels remaining in the store, which were worth about $230, and gave him her memorandum check for the sum of $400; that she at once bought $105 of new goods, and then found that the business could not be carried on at a profit, and after three or four days sold the whole stock of goods, including the purchase of $105, to a man in New York city, for the sum of $2,500 in cash; and that out of that sum the $400 check was paid to the judgment debtor, and $105 for the goods purchased after the sheriff's sale, leaving $1,995, a less sum than was due upon the two confessed judgments.

The answer admits that the goods that were in the store at the time of the sheriff's sale had cost $4,000, but alleges that they were not worth so much, because they were badly selected.

The father and sister, in answering as to the consideration of their judgments, state it as follows:

As to the father's judgment, that it was the sum of

"one thousand dollars loaned by him to the said Harry A. Norton, on or about the first day of September, in the year 1895, and the sum of $390 loaned by him to the said Harry A. Norton, in the middle of September, 1895, making the full sum of $1,390."

Bates *v.* Norton.

As to the Sophie Platt judgment, the answer says that the consideration of it was " the sum of $500, which sum she loaned and advanced to the said Harry A. Norton on or about the 15th day of September in the year 1895."

The foregoing is all the answer made to the specific interrogatories on this subject inserted in the amended bill.

The statutory affidavits annexed to the judgment rolls are severally as follows : That of the father is

"that the promissory note for $1,390, upon which judgment is about to be confessed, was given for the sum of $1,390, money loaned and advanced by deponent, the plaintiff, to said Harry A. Norton, the defendant, *on the 8th of October, 1895.*"

The affidavit of Mrs. Platt to her judgment is as follows :

"It being the promissory note for $500, upon which the judgment is founded, and is the sum of $500, money loaned and advanced by said Sophie Platt, the deponent, to the said Harry A. Norton, the defendant, on the 20th day of September, 1895."

John Norton, the father, when examined before the master in the discovery proceedings on the 2d of December, swore, in substance, that on the 30th of August, 1895, he borrowed from the National Newark Banking Company, on the note of his son at thirty days, endorsed by himself, the sum of $1,000, less discount, and himself handed the money to his son Harry. He swore he drew his check for the amount and received the money in currency and handed it right over to his son.

The fact with regard to this $1,000 is that John Norton endorsed Harry's note for that amount, and that it was discounted and placed to Harry's credit in the National Newark Banking Company, where he kept an account, and that Harry himself drew his check for $850 of it on the same day, August 30th, and later on drew out the balance of $150. That note was not paid at maturity, but was renewed for two months, on the 30th of September, and was finally paid at maturity by the father, as endorser, a day or two before he was examined before the master and a month after his judgment was entered.

At the hearing John Norton was called as a witness for the defendants, and his attention was called to what he swore to before the master, whereupon he testified that he had not so sworn and that the master had wrongly reported him. But I have no doubt at all that he was correctly reported. The evidence was taken by a reliable master, who is himself a skillful stenographer. Besides, the clear interest of the defendants at that time was to fortify as best they could the truth of the affidavits annexed to the judgment rolls by proving that the father did in fact loan the money to the son.

With regard to the $390, John Norton swore that it was loaned by him to Harry, in small sums of $50, $25 and $75 at a time, during the month of September, 1895, in cash taken out of the father's safe, where he kept his money. No written memorandum was produced in support of this statement, and no note or due-bill was taken or entry made.

Mrs. Platt was also called and examined in the discovery proceedings on the 2d of December. She swore that she was a married woman and lived with her husband, and that she loaned her brother Harry $500, in small sums of money, $50 and $75 at a time, on various days, during the month of September, 1895, and did not take any note or other memorandum of the affair.

Mrs. Platt further swore, and to a certain extent she is corroborated by the bank account, that in the month of October, 1895, she loaned Harry, in one sum of money, $500, and that he returned it to her the same day. It is true that $500 was deposited to his credit in bank on the 15th of October and the same amount drawn out again on that day. She says she borrowed that $500 from her father, but that the other money loaned Harry belonged to her.

The proofs further show that on the 15th of October Harry Norton called at the store of Bates & Company, in New York city, and asked for a statement of his account, which was made up and showed $402.27 due. He thereupon drew a check for $402.27 on the National Newark Banking Company (where he had just deposited $500, borrowed from his sister) to the order of A. J. Bates & Company and handed the check to them.

After this was done and his account receipted, he said he wished to buy some more goods, and the credit man of Bates & Company, to whom the payment was made and who determined to what extent each customer should be trusted, told him to go and pick out his goods and come and see him further. He went and picked out goods to the amount of $1,000, came back to the credit man and stated that he had ordered goods to that amount. The credit man then asked for a statement of his affairs, which being given, the credit man declined to sell him so much as $1,000, but offered to sell him about the amount of the bill which he had just paid, whereupon Norton declared that he would not buy any, left the store, went home and immediately drew out the $500 standing to his credit in the bank, and the check given to Bates & Company was protested for non-payment and was the foundation of their judgment. Suit on it was commenced October 28th and served on Harry Norton on the 30th of October, 1895, and judgment was confessed the same evening to his father and sister.

The proofs show that the father was aware that the son's business had not been and was not prosperous, and that he was somewhat in debt and embarrassed, and that the sister knew that her brother was borrowing money of his father as well as of herself.

That the son intended to practice a fraud on Bates & Company, on October 15th, is plain enough. He pretended to pay, by check, a balance of $402.27 due them, and then, on the strength of his ability and disposition to pay promptly thus manifested, he proposed to buy $1,000 of goods on credit at a time when the indications are that he did not need them.

There is, however, no direct evidence that this dishonest project was known by his father and sister.

Complainants, as against the father and sister, rely upon the general aspect of the case, supported by certain specific matters of detail.

Bates & Company's suit was commenced October 28th, and the papers were served October 30th. On the same day these two judgments are confessed, not in the circuit court where most

convenient, but in the supreme court where their existence would attract less attention; the levy and the formal advertisement for sale are made at once, and the property sold on the 6th of November, so alleged in the bill and admitted in the answer. There was no general advertisement or any serious effort made to obtain the full value of the goods, but they are sold in this hurried way and removed from the state before Bates & Company recovered judgment. The complainants contend, and, I think, with some reason, that there were goods enough in the store to pay complainants' several claims, as well as the amount due on the confessed judgments, admitting all to be due, if complainants had been permitted an opportunity to get a levy and a fair sale after full advertisement; and that the affair was purposely so managed that not only were the complainants prevented from getting a levy, but $400 in cash was put in the pockets of the debtor, after satisfying the whole amount due upon the judgments.

Again, the judgment debtor was a married man and kept house, and yet $200, for his exemption, was set off to him out of the store goods, without inquiry as to whether he had not furniture &c. in his house of that value.

I think this general aspect, to say the least, throws a heavy burden upon the father and sister in any effort to sustain the *bona fides* of their judgments and to show that no fraudulent use was made of them. As to those, the father's judgment was clearly invalid at law to the extent of $1,000. The note which represented that part of the debt was running in the bank and matured on November 30th, one month later; the father was contingently liable upon it, but had not advanced a cent, and yet the affidavit stated that the consideration was $1,390, cash loaned by the father to the son *on the 8th of October*. No explanation was made of the palpable falsity of this affidavit.

Then the evidence of the father, as to the other items going to make up the $390, is unsatisfactory in the extreme. After swearing that the whole sum of $1,390 was loaned on the 8th of October, he swears that the $390 was loaned, as already stated, in small sums from time to time during the month of Septem-

17

ber, and yet not a scratch of a pen is produced in support of that statement.

Taking into account his prevarication with regard to the loaning of the $1,000 borrowed from the bank, the clear falsity of his affidavit annexed to the judgment roll, and his unsatisfactory evidence as to the $390, I am led to the conclusion that fraud in his judgment is clearly proved, and no credit should be given him as to the $390. It is well settled that where a debtor and creditor conspire to give the creditor a preferential security showing an amount due greater than is actually due, for the purpose of hindering and delaying other creditors, such security is wholly void as to the other creditors.

The only point upon which I have had trouble in the father's case was as to the $1,000 actually paid by him upon an obligation for which he was contingently liable at the time the judgment was confessed.

If the complainants could have got a judgment and levy on the goods before they went out of the state, and the proceeds of the sheriff's sale had been paid into the law court, there can be no doubt but that John Norton would not have been allowed for that much of his judgment. The authorities on that subject are clear. I refer to *Ely* v. *Parkhurst, 1 Dutch. 188; S. C. on error, 3 Dutch. 555; Warwick* v. *Petty, 15 Vr. 542,* and *Stirling* v. *Fleming, 24 Vr. 652,* the latter in the court of errors and appeals.

In this last case a judgment was entered by confession, in which the affidavit plainly stated that a part of the judgment was founded upon promissory notes endorsed by the complainant for the accommodation of the defendants and discounted, "the payment of which is this day assumed." There was no fraud or concealment, or any unfair use made of the execution. But in the contest between different execution creditors the judgment was reduced to the amount actually due at the time the judgment was entered.

There is also a case in the court of chancery of *Sayre* v. *Hewes, 5 Stew. Eq. 652,* decided by Vice-Chancellor Van Fleet, affirmed, as to the matter in question, on appeal, and cited with

approval by Mr. Justice Depue in *Warwick* v. *Petty, 15 Vr. 547.* In *Sayre* v. *Hewes* Vice-Chancellor Van Fleet held that a judgment confessed to secure a party against a contingent liability was not good even in equity. But in that case the judgment creditor had not at any time been called upon or obliged to pay anything upon the contingent liability secured against. Notwithstanding the difference between that case and this, I think the principle applies here.

The law on the subject is stated with great clearness by Mr. Justice Depue in *Warwick* v. *Petty, 15 Vr. 548,* as follows : " It may therefore be considered as decided by the court of errors that a judgment by confession for a gross sum, made up in part of a debt then actually due and owing and in part of a contingent indebtedness of a definite amount to become due in the future, will be set aside as to the latter, at the instance of subsequent judgment creditors, although such contingent indebtedness matured and became an actual debt before the other judgment creditors recovered their judgments, and that such confessed judgment will be allowed. to stand for so much as was actually due and owing when it was entered, if the affidavit, to that extent, truly stated the consideration, provided it appears that the judgment was taken for the larger sum, without any fraudulent intent."

And again (at *p. 550*): "Whether the judgment shall be set aside entirely or only in part will depend upon whether or not it was entered for a greater sum than was actually due, with a fraudulent intent. * * * A judgment laid upon the property of a debtor for more than is due is in clear violation of the law. It tends to keep other creditors from pressing for their debts and gives the debtor repose from the harassment of other creditors by conveying the assurance that creditors' suits would be useless, nothing could be collected, and this is obnoxious to the policy of the law which denominates as illegal all transactions the tendency of which is to hinder and delay creditors. Such a burden is, *prima facie*, wholly fraudulent, and the burden of rebutting and overcoming the inferences of fraud lies upon the party who seeks to uphold the transaction. And the

Benwell *v.* Newark.

burden of proof is not successfully met by mere proof that all the money was afterwards advanced on the judgment which the judgment creditor was required by the statute to advance before he took his judgment and covered the defendants' property with it.   On the issue of fraud, proof that the money which was not actually due and owing when the judgment was entered was subsequently advanced, is evidence, and evidence only, of more or less weight according to the circumstances of the particular case."

Applying that test here the result is, I think, that the father's judgment must be held to be wholly void.   The proof that a fraudulent use was made of the judgment overcomes all equity arising from the actual payment of the $1,000.

With regard to the judgment of the sister: While there is no proof that she did not loan the money to her brother, yet her own affirmative proof in that behalf is very unsatisfactory, and when we find her judgment used in concert with her father's for a fraudulent purpose, I think that it must be declared void also, although the complainants may have a full remedy without resorting to her.

I will advise a decree accordingly.